Filed 3/5/21  In re J.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | C092161 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> R.V., <br><br> Defendant and Appellant. | (Super. Ct. No. STKJVDP20170000402) |

　Appellant R.V., mother of the minor, appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code,

1

§§ 366.26, 395)[1]  Mother contends the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied.  We disagree and affirm the juvenile court's orders.

BACKGROUND

The minor in this case came to the attention of the San Joaquin County Human Services Agency (the Agency) following a June 2, 2017 report that mother was using methamphetamine with two of her adult children who resided in the home.  The reporting party also observed mother walking down the street and not paying attention to the minor who was following at an "unsafe distance behind."  Mother has a history of mental health issues, was not taking medication, and was exhibiting signs of unmet mental health needs.  Mother had two prior dependency cases during which she received extensive services, but she had made little or no progress in the areas of substance abuse, counseling, and parenting education.  Mother had received individual counseling in 2005, 2006, 2010, and 2011, but was unable to address her mental health issues, domestic violence victimization issues, or decrease her feelings of depression.  Mother had also previously submitted to, but did not fully participate in, three psychological evaluations.  The diagnosis showed that mother's psychotic disorder was likely induced by methamphetamine.  Mother had begun using methamphetamine at age 17.  She had also previously completed substance abuse treatment but was unable to identify triggers and routinely relapsed.

The minor (then three years of age) was detained on August 25, 2017.  The juvenile court ordered supervised visitation and provided the Agency discretion to lift supervision.  At the October 2017 jurisdictional hearing, the Agency advised the juvenile court that mother's visits with the minor had been increased and the supervision lifted.  The juvenile court took jurisdiction based on mother's mental health and substance abuse issues.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

In its January 2018 disposition report, the Agency reported that the minor was doing well in placement and was bonding with his caretaker. Mother had consistently visited twice a week for two hours and was reportedly engaged and attentive at visits. The visitation schedule was being revised, however, because mother had entered a residential treatment facility. The juvenile court granted mother Saturday visits with the minor at the treatment facility and continued the disposition hearing.

The minor was adjudged a dependent at the March 2018 disposition hearing and the juvenile court ordered mother to participate in reunification services. Mother's case plan included drug testing, obtaining suitable housing, compliance with court orders, compliance with psychological medication, personal counseling, and parenting education.

In May 2018, the Agency advised the juvenile court that mother was not taking her prescribed mental health medication and had "episodes" (subsequently described as reporting she was hearing voices) during visits with the minor and in therapy sessions. The juvenile court granted the Agency's request to return mother to supervised visits, again with the discretion to lift supervision.

In August 2018, the Agency reported the minor was doing well in his placement, which was with non-related extended family members. He had been placed there on October 2, 2017. The minor also appeared happy when visiting with mother, who was regularly participating in supervised visits. The minor seemed comfortable in her presence and seemed to have a bond with mother. Mother was generally appropriate with minor and attended to his needs during visits. She had not been mentioning hearing voices, as she had before, but had not been medication compliant for several months.

At the September 2018 review hearing, the juvenile court added participation in a mental health assessment to mother's reunification plan. It also increased mother's visits but denied her request for overnight visits. The Agency remained authorized to lift supervision in its discretion.

In October 2018, the individual who supervised visits with the minor at mother's transitional housing facility reported "a lot of concerns" with mother's behavior,

including mother saying out loud "I don't care about your sobriety bitch" while mother was alone in her room. At one visit, after being told not to leave the visitation room to apply makeup in preparation for meeting her boyfriend afterward, mother responded "what am I supposed to do, just stare at him?" Mother was reportedly not taking her medication regularly. It appeared mother's symptoms were increasing and were being displayed through her behavior.

In January 2019, a different individual who was supervising visits reported an improvement in mother's visits. Mother's visits were going well and there were no concerns. Mother was still visiting for two hours twice a week. She was engaging, nurturing, and she responded quickly to the minor's needs. The minor was reported to be happy in mother's presence. Mother was reported to have improved in communicating, setting boundaries, and engaging in activities with the minor. The worker who transported the minor to and from visits, however, noted that on a few occasions the minor was observed to be sitting on the sofa watching television by himself while mother was on her phone.

The minor continued to do very well in his placement and seemed happy in the foster mother's presence. He often rested his head on her shoulder during compliance visits and told her often that he loves her. The foster parents had adopted the minor's older brother and were willing to provide permanency for the minor if reunification efforts failed.

Mother unsuccessfully sought increased visitation in February and April 2019. The Agency's August 19, 2019 status review report set forth concerns with mother's behavior at visits, including her yelling that she hated the Agency and cursing at the minor. Mother had participated in counseling but lacked progress in meeting treatment goals, continued to be medication non-complaint, and continued her relationships with known drug users while she was supposed to be working on her sobriety.

The review hearing took place in October 2019. The social worker testified that visits remained supervised because mother was not medication compliant. Mother was

4

also unable to manage the minor at visits. The minor called mother names, went through her purse, and ran around the visitation room without any reprimand for his behavior. Mother was also observed cursing at the minor in Spanish.

Mother testified that she would like unsupervised visits. She enjoyed visits and thought they were productive, but she did not know if the minor felt the same. During visits, she and the minor played, did arts and crafts, and talked. She had completed parenting education but did not think that it helped her understand how to be a better parent.

The juvenile court noted mother's limited progress in therapy and unacceptable refusal to maintain medication compliant, found a substantial risk of detriment remained should the minor be returned to mother's custody, and terminated reunification services. Visits were then ordered reduced to one visit per week.

The Agency continued to report that mother had a difficult time prompting the minor or holding him accountable for his actions and that the visitation supervisor had to intervene often during the visits. The Agency considered the minor adoptable. He remained in his current home with his sibling, where he had been placed for two years, had adjusted well, and had an apparent bond with his foster mother who wanted to adopt him.

The Agency filed a section 366.26 report on January 15, 2020, recommending termination of parental rights. The minor was still doing well in his placement and did not present with any mental or emotional issues. The foster mother, however, had reported that the minor appeared to be having some confusion as to who his "real mommy" is and believed some counseling could help the minor process his thoughts. Accordingly, the minor had begun to receive therapy through Valley Community Counseling Services and was being visited by his mental health therapist once a week at school.

The minor had been residing with his non-related extended family member caretakers for two years and three months and was continuing to flourish in his placement. He shared a bedroom with his biological brother, who the caretakers had

5

adopted.  The caretakers also had a toddler daughter who shared a room with the caretakers.  The children enjoyed playing with each other.  The caretakers reported they were attached to the minor and love him as if he were their own, and the minor has formed an attachment to them and refers to them as "mom" and "dad."  The minor was too young to understand the legality concerning adoption and had vocalized that he enjoys living with his brother and current caregivers.

Mother's visits, which remained supervised, had been reduced in October 2019 to once a week for one hour.  The minor appeared to enjoy the visits and was often excited to see and spend time with her, but there was no report of any negative effect on the minor following the reduction in visits.  The visits were, for the most part, observed to be of good quality, although there had been a few observable issues during visits.  Mother would generally read to the minor and spent time playing and interacting with him.  There had been some instances, however, of mother becoming preoccupied with her phone rather than interacting with the minor.  The minor addressed mother as "mom," hugged her often, and appeared to be bonded to her.

Mother testified at the section 366.26 hearing regarding the nature and quality of her visits with the minor.  She stated the minor was happy to see her at the beginning of visits, as demonstrated by running up to her, yelling and hugging her.  She would bring him food and they would play board games, do puzzles, and practice writing the minor's name.  The minor appeared happy and enjoyed showing her he knew how to write his name.  Mother would also read to the minor and ask him about his school and holidays.  He calls her "mom" and refers to his caretaker by her first name when he talks to her.  Throughout the dependency, the minor had only said he wanted to come home with her on two occasions.  Mother was not sure how the minor would feel about not seeing her anymore, but she did not want it to devastate him.  He did not cry or become upset at the end of visits and had, on some occasions, left the visit prematurely to see the caretaker when he saw her check-in, and had to be reminded to say goodbye to mother and end the visit.

6

Mother's counsel argued the beneficial parental relationship exception to adoption applied based on mother's regular visitation and bond with the minor. The juvenile court found the minor adoptable, found that no exception to adoption applied, and terminated parental rights.

DISCUSSION

Mother contends the juvenile court erred in finding the beneficial parental relationship exception to adoption does not apply in this case. We disagree.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . The permanent plan preferred by the Legislature is adoption. [Citation.]' [Citation.] If the court finds the child is adoptable, it must terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368, italics omitted.)

There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i) [the beneficial parental relationship exception].)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) In addition, even if there is such a bond, the parent must prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; accord *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1345.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.

7

If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, at p. 575.) On the other hand, " '[w]hen the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent[-]child relationship, the court should order adoption.' " (*In re Jasmine D.*, at p. 1350; see *In re Autumn H.*, at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53, quoting *In re Jasmine D.*, at p. 1348.) The beneficial parental relationship exception to adoption is an exception to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.*, at p. 53.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

Mother did not meet her burden here. Although mother maintained regular visitation, she failed to establish that the minor had such a significant, positive emotional attachment to her that the benefit of maintaining it outweighed the benefits the minor would obtain from adoption. (See *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Considering, as the juvenile court must, factors such as the age of the child, the portion of

8

the child's life spent in the parent's custody, the positive or negative effect of interaction between the parent and the child, and the child's particular needs (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811), the juvenile court did not err in determining the beneficial parental relationship exception to adoption does not apply.

At the time of the section 366.26 hearing, the minor was five years old and had been out of mother's care for 31 months, almost half of his young life. The minor generally appeared to enjoy visits with mother, but he was also unaffected at the end of visits and no negative effects were reported when visitation was reduced. In fact, he sometimes left visits to go to his caretaker when he saw her arrive and had to be reminded to go say goodbye to mother and end the visit. The minor was reported to have some bond with mother, but he is also bonded to his caretakers with whom he has resided, with his brother, for over two and a half years.

Mother emphasizes that the minor calls her "mom," but the minor also calls his foster parents "mom" and "dad." Mother also emphasizes that the minor was "confused" about who is his "real mommy," such that the Department had determined counseling was appropriate to assist the minor in adjusting to a permanent plan. But this confusion does not equate with detriment or great harm. A five-year-old's confusion is entirely understandable under these circumstances, but it does not necessarily amount to the trauma mother now argues he will suffer upon termination of parental rights. In fact, mother testified that she did not know if there was any benefit to the minor in continuing visits with her. Moreover, there is no evidence that not terminating parental rights and leaving the minor in a guardianship would alleviate the minor's confusion.

A parent must show more than frequent and loving contact, emotional bond, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) While mother established the minor enjoyed visits and did have some bond, she did not establish this to be an extraordinary case in which preservation of parental rights must prevail over the Legislature's preference for adoptive placement. (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

9

DISPOSITION

The orders of the juvenile court (terminating parental rights) are affirmed.


/S/
MAURO, Acting P. J.

We concur:


/S/
DUARTE, J.


/S/
HOCH, J.